UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RTM Capital Partners, Inc., et al, | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | No. 3:18-mc-0076 (RNC) |
| v. | : | |
| | : | |
| JAMES R. BARNES, et al, | : | |
| | : | |
| *Defendants.* | : | |
| _____ | x | |

## RULING RE: BARSTORMER'S MOTION TO INTERVENE, COMPEL ARBITRATION, AND LIMIT THE SCOPE OF THE PROCEEDINGS

For the reasons that were explained in detail by the Court in its ruling on the record on September 29, 2021, the *Motion to Intervene, Compel Arbitration, and Limit the Scope of the Proceedings* (Doc. No. 14) by Barnstormer Summit Lift, LLC (hereinafter, "Barnstormer"), is **DENIED, IN PART**, and **GRANTED, IN PART**.  It is **GRANTED** as to Barnstormer's motion to intervene and **DENIED** as to the request for the Court to compel arbitration and to limit the scope of the proceedings.  The Court summarizes below the reasons for its ruling, which previously articulated verbally on September 29, 2021.

**I.      The Factual and Procedural Background**

The following allegations, which are at the heart of the dispute before this Court, are derived from the parties' pleadings in this matter and from actions instituted in Vermont by plaintiffs and intervenor Daniel Solaz.   Defendant James Barnes (hereinafter, "defendant Barnes") founded the Hermitage Club, a private ski club located at Haystack Mountain in Willington, Vermont.  Doc. No. 10-1 at 1.  The plaintiffs, or their respective members, are all former members of the Hermitage Club.  *Id.*  Defendant Barnes also formed and managed the

1

affiliated Hermitage Inn Real Estate Holding Company, LLC (hereinafter, "Hermitage Real Estate" or "HIREHCO"). *Id.* at 2; Complaint at ¶¶ 5-6*, RTM Capital Partners, Inc., et. al. v. Barnes*, 5:18-CV-56(GWC) (D. Vt. Mar. 29, 2018) (hereafter, "*RTM Vermont Complaint*"). Through Hermitage Real Estate, defendant Barnes developed and sold real estate for purchase by members of the Hermitage Club. *RTM Vermont Complaint*, at ¶7.   Plaintiffs each purchased town homes from Hermitage Real Estate. *Id.* at ¶10. Defendant Barnes accepted the plaintiffs' money and represented that construction was proceeding as planned. *Id.*, at ¶¶ 20-28, 35-43 and 50-59.  Plaintiffs allege that, in fact, there was no meaningful progress in construction of the town houses and that defendant Barnes misappropriated the funds for other uses. *Id.*, at ¶¶ 66, 72, 84-85.  To date, plaintiffs never obtained title to the land on which the homes were to be built.  Doc. No. 10-1, at 2.

Subsequently, plaintiffs sued Barnes in the United States District Court for the District of Vermont.  Defendant Barnes failed to appear in that action, and on June 18, 2018, the plaintiffs obtained a default judgment against Defendant Barnes in the amount of $6,250,976.00, inclusive of treble damages, attorney's fees and costs. *See* Doc. No. 1; *see also RTM Capital Partners, Inc., et. al. v. Barnes*, 5:18-CV-56-(GWC), Doc. No. 7 (D. Vt. June 18, 2018).   Plaintiffs registered their judgment in the United States District Court for the District of Connecticut, effectively commencing this action, on July 23, 2018.  Doc. No. 1.  That judgment is yet to be satisfied.

Barnstormer is a Connecticut limited liability company that defendant Barnes utilized to fund a ski chairlift for the Hermitage Club.  Doc. No. 10-1 at 2.  Hermitage Real Estate was initially the managing member of Barnstormer. *Id.*  Barnstormer solicited members of the Hermitage Club to become investors in Barnstormer in order to fund the chairlift. *Id.*  Hermitage

2

Real Estate executed a promissory note to Barnstormer in the principal amount of $7,825,000.00 and granted Barnstormer a first priority security interest in the chairlift to secure the loan. Doc. No. 10-1 at 2-3. Hermitage Real Estate eventually defaulted on its loan obligations. *Id.* at 3.

On May 22, 2019, in the District of Vermont, Hermitage Real Estate's creditors filed an involuntary Chapter 7 bankruptcy proceedings against Hermitage Real Estate. *Id.*; *see generally In re Hermitage Inn Real Estate Holding Co., LLC, et al,* 19-10214 (CAB), Doc. No. 1 (Bankr. D. Vt. May 22, 2019). Thereafter, the Bankruptcy Court approved the sale of the chair lift and Barnstormer received proceeds of approximately $3,356,000.00 from the bankruptcy estate's sale of the chair lift. *In re Hermitage Inn Real Estate Holding Co., LLC, et al,* 19-10214 (CAB), Doc. No. 498 (Bankr. D. Vt. May 15, 2020). Plaintiffs allege that defendant Barnes holds a capital account balance in Barnstormer of $1,499,556.00, which they claim equates to a 19.765% of Barnstormer's equity. Doc. No. 10-1 at 3. According to plaintiffs, after deducting Barnstormer's expenses, defendant Barnes is due a liquidating distribution of $626,248.50. *Id.* at 4. Barnstormer challenges the validity of defendant Barnes' capital account balance on the grounds that Barnstormer has not identified any cash transfer from defendant Barnes to Barnstormer's operating account.[1] *Id.* While Barnstormer has expressed its intentions to immediately distribute the majority of its funds as liquidating distributions to its members, it has

---

[1] While Hermitage Real Estate was initially Barnstormer's managing member, several individual members of Barnstormer filed a derivative suit against Hermitage Real Estate and Barnes in Connecticut Superior Court and entered into a stipulated judgment in which Hermitage Real Estate was removed as managing member. Thereafter, another member of Barnstormer became its primary managing member. *See generally Fabio Calia (Derivatively on Behalf of Nominal Defendant Barnstormer Summit Lift, LLC) et al. v. Hermitage Inn Real Estate Holding Company LLC, et al.*, Superior Court, Judicial District of Hartford, Docket No. HHD-CV18-5056517-S (February 2, 2019).

also represented that it has reserved sufficient funds to cover defendant Barnes' putative distribution. *Id.*

On April 11, 2019, plaintiffs obtained a charging order against defendant Barnes' transferable interest in Barnstormer in the United States District Court in Vermont pursuant to Vermont state statute.[2]  Doc. No. 10-2.  On September 24, 2019, after having registered their federal judgment in this Court, plaintiffs moved for a charging order, pursuant to Conn. Gen. Stat. § 34-259b, against defendant Barnes' distributable interest in Barnstormer.  Doc. No. 4.  On September 25, 2019, this Court (Hon. William I. Garfinkel, U.S.M.J.) issued the requested charging order, *see* Doc No. 7, which constituted a lien against Barnes' transferable interest in Barnstormer, including any distributions.

Daniel Solaz, formerly the chief financial officer of the Hermitage Club, filed suit against defendant Barnes in state court in Vermont for unpaid wages and obtained a default judgment against defendant Barnes for $320,917.16, which included double damages, attorney's fees and costs.  Doc. No. 10-1 at 5; *See generally Daniel Solaz v. James Barnes, et al.*, Superior Court, Judicial District of Hartford, Docket No. HHD-CV18-6100172-S (Sept. 12, 2018). Solaz filed suit against Barnes in Connecticut Superior Court on September 12, 2018, to domesticate his Vermont judgment.  *Id.*  Solaz obtained judgment in Connecticut on July 8,  2019.  Doc. No. 10-1 at 5; *see also* Doc. No. 60 at 2.  On July 30, 2019, pursuant to Conn. Gen. Stat. § 34-259b, Solaz filed an application for a charging order against Barnes' transferable interest in Barnstormer, which was granted in Connecticut Superior Court on August 13, 2019.  Doc. No. 10-5; Doc. No. 60 at 2.  On August 3, 2021, this Court granted Solaz's motion to intervene in this matter pursuant to Fed. R. Civ. P. 24.  Doc. No. 59.

---

[2] The District Court in Vermont issued the charging order pursuant to 11 V.S.A § 4074.

4

On April 19, 2021, John T. Del Negro, as Trustee of the Irrevocable Grantor Retained Annuity Trust (hereinafter, "GRAT") created on September 21, 2009, also moved to intervene in this matter pursuant to Fed. R. Civ. P. 24, on the ground that defendant Barnes had previously assigned his interest in Barnstormer to the Trust as security for a loan that was issued to him. Doc. No. 45.  This Court granted that motion on April 22, 2021.  Doc. No. 46.

On March 22, 2021, the undersigned received a referral (Doc. No. 36) of this matter for the resolution of Barnstormer's *Motion to Intervene, Compel Arbitration and Limit the Scope of the Proceeding* (Doc No. 14).  On June 22, 2021, the Court heard oral argument on the referred motions. Doc. No. 56.

## II.   <u>Barnstormer's Motion to Intervene</u>

Pending before the Court is Barnstormer's motion to intervene in this matter.  Federal Rule of Civil Procedure 24(a)(2), provides in pertinent part:

(a) Intervention of Right: On timely motion, the court must permit anyone to intervene who:
*    *    *

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

The Second Circuit has held that a motion to intervene brought pursuant to Rule 24 should be granted when four conditions are met: "(1) the motion is timely; (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the other parties." *Mastercard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.,* 471 F.3d 377, 389 (2d Cir. 2006). Failure to establish any of these elements is reason to deny

intervention, and the would-be-intervenor has the burden to establish all elements. *See Reid L. v. Ill. State Bd. of Educ.*, 289 F.3d 1009, 1017 (7th Cir. 2002).

As a preliminary matter, the Court must determine whether the motion is timely. *See Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996). "Among the most important factors in a timeliness decision is 'the length of time the applicant knew or should have known of his interest before making the motion." *Id.* "[T]he determination of whether an application is timely is subject to the district court's discretion." *In re Bank of New York Derivative*, 320 F.3d 291, 300 (2d Cir. 2003). Courts consider four factors when determining if a motion to intervene is timely: "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." *Id*. (quoting *United States v. Pitney Bowes, Inc*., 25 F.3d 66, 70 (2d Cir. 1994)). "This test 'is a flexible and discretionary one, and courts generally look at all four factors as a whole rather than focusing narrowly on any one of the criteria." *S&S Kings Corp. v. Westchester Fire Ins. Co*., No. 16-CV-2016(RA), 2017 WL 396741, at *1 (S.D.N.Y. Jan. 27, 2017) (quoting *Tachiona ex rel. Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 394 (S.D.N.Y. 2002)). Nonetheless, "[a] would-be intervenor's failure to meet all of [the requirements under Rule 24(a)(2)] justifies the denial of its motion." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 176 (2d Cir. 2001) (citing *Pitney Bowes*, 25 F.3d at 70). *See also, e.g.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001) ("Denial of the motion to intervene is proper if any of these requirements is not met.").

As mentioned above, and relevant to the Court's consideration of the timeliness of Barnstormer's motion to intervene, plaintiffs obtained a default judgment against defendant Barnes in federal court in Vermont on June 18, 2018. *See* Doc. No. 1; *see also RTM Capital*

*Partners, Inc., et. al. v. Barnes*, 5:18-CV-56-(GWC), Doc. No. 7 (D. Vt. June 18, 2018).  On July 23, 2018, plaintiffs registered that judgment in the District of Connecticut.  Doc. No. 1.  In May 2019, Hermitage Real Estate's creditors instituted an involuntary Chapter 7 bankruptcy against Hermitage Real Estate in the District of Vermont.  *See generally In re Hermitage Inn Real Estate Holding Co., LLC, et al,* 19-10214(CAB), Doc. No. 1 (Bankr. D. Vt. May 22, 2019).  On September 25, 2019, plaintiffs obtained a charging order in the District of Connecticut against defendant Barnes' transferable interest in Barnstormer.  Doc. No. 7.  On May 14, 2020, Hermitage Real Estate's Chapter 7 Trustee closed the sale of the ski lift that was collateral for the Barnstormer loan to Hermitage Real Estate and disbursed $3,356,090.46 to Barnstormer.  *In re Hermitage Inn Real Estate Holding Co., LLC, et al,* 19-10214(CAB), Doc. No. 498 (Bankr. D. Vt. May 15, 2020).  Barnstormer reserved $626,248.50 as a potential liquidating distribution due to defendant Barnes.  On July 8, 2020, plaintiffs moved to enforce their charging order against the reserved funds and requested that this Court issue a show cause order as to why Barnstormer should not pay the reserved funds to plaintiffs pursuant to the charging order previously issued by this Court.  Doc. No. 10.  On July 13, 2020, this Court issued the show cause order and ordered Barnstormer to respond by August 10, 2020.  Doc. No. 12.  On August 7, 2020, Barnstormer filed its motion to intervene, compel arbitration and limit the scope of the proceedings.  Doc. No. 14.

On these facts, the Court finds that the timeliness requirement is satisfied.  Barnstormer sought intervention to challenge the existence of any distributional interest owed to defendant Barnes within a relatively short period after Barnstormer realized proceeds from the sale of the ski lift that had served as collateral for its loan to Hermitage Real Estate.  Further, Barnstormer did so after it reserved funds that it believed constituted Barnes' potentially distributable interest

and after it received notice of plaintiffs' intent to seek enforcement of their charging order against the funds held in reserve.  Barnstormer's motion to intervene placed plaintiffs on immediate notice that it intended to challenge plaintiffs' enforcement of the charging order and the grounds upon which it would mount that challenge.  Not only did Barnstormer seek intervention within the time period allotted by the Court to show cause why enforcement of the charging order should not occur against Barnes' putative distributional interest, but Barnstormer advanced those claims at a sufficiently early stage of this litigation that permitted plaintiffs an opportunity to obtain discovery and properly prepare to litigate these claims.  Accordingly, Barnstormer's motion to intervene is timely.

Barnstormer also has a significant protectable interest in the property that is the subject of this action.  Barnstormer has approximately forty members each of whom made some financial investment in Barnstormer.  On behalf of its members, Barnstormer has an interest in ensuring that whether defendant Barnes has a distributional interest is correctly determined and, if so, that the amount of such interest to be applied against the reserved funds, which would otherwise be available for distribution to its members, is correctly calculated.  Accordingly, Barnstormer and its members have a protectable interest in the reserved funds.  Furthermore, if Barnstormer is not permitted to intervene, it will be unable to advance its position that defendant Barnes does not have a transferable or distributable interest and cannot assert its interests and that of its members, specifically, that the reserved funds are available to them, rather than Barnes.  Incorrectly inflating defendant Barnes's distributional interest would dilute each member's interest and inadvertently prejudice each of them.  The Court agrees with Barnstormer that its interests and those of its members are affected by the present action.  Barnstormer certainly is unable to rely on any other parties to this action to advance these claims on its behalf.

8

Barnes himself claims that he has a distributional interest, which contradicts Barnstormer's position, and it is certainly in the best interest of Barnes and John T. Del Negro, as Trustee of the Irrevocable Trust which purportedly holds Barnes' interest in Barnstormer, to advance such a position.  Similarly, plaintiffs and intervenor Solaz seek enforcement of their charging orders against the reserved funds, which necessarily requires them to argue that Barnes has a distributable interest, a position diametrically opposed to the position advanced by Barnstormer that Barnes has no such interest.  Further, plaintiffs, Solaz, Barnes and Del Negro may also argue that Barnes' distributable interest is greater than the amount of the reserved funds, again placing them in direct contravention of Barnstormer's position.  In short, Barnstormer cannot rely on the other existing parties to advance the claims it wishes to make in this matter because it is not in the interests of those other parties to do so.  This case involves many stakeholders and the Court finds that a global resolution inclusive of all necessary parties would be most efficient. Barnstormer is one of those parties as it holds in escrow assets that are at issue and its presence is critical to determining whether Barnes is owed a distributional interest and the amount of any such interest.

For the foregoing reasons, the Court **GRANTS** Barnstormer's *Motion to Intervene, Compel Arbitration, and Limit the Scope of the Proceedings* (ECF No. 14) only as it relates to Barnstormer's request to intervene in the present matter.

### III.   <u>Ancillary Jurisdiction over Barnstormer</u>

Having permitted Barnstormer to intervene in this matter, the Court must next address the issue of whether it has jurisdiction to decide the present matter.  Specifically, the Court must decide whether granting Barnstormer's motion to intervene destroys diversity and causes the Court to lose subject matter jurisdiction or whether complete diversity of citizenship of the

parties is irrelevant because the Court retains ancillary jurisdiction.  For the reasons that follow, the Court agrees with plaintiffs and concludes that an exercise of ancillary jurisdiction is proper in this case and that complete diversity of the parties is unnecessary.

By way of background and as confirmed by the parties at oral argument, plaintiffs are all residents of New Jersey.  Doc. No. 15.  Defendant is a citizen of Connecticut.  *Id.*  Barnstormer is a Connecticut limited liability company with members from New Jersey, Connecticut, Massachusetts, and New York.  *Id.*  Barnstormer argues that, if it is permitted to intervene, this Court will no longer have complete diversity between the parties and will be barred from exercising supplemental jurisdiction over the dispute.  *Id.*  In Barnstormer's briefing, however, it fails to address whether this Court, while not having complete diversity of the parties, would still be able to exercise ancillary jurisdiction over the matter given the context of this action. The Court finds that it does have ancillary jurisdiction.

It is well-established that federal courts have ancillary jurisdiction to enforce their judgments. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 378 (1994) ("[T]he doctrine of ancillary jurisdiction [] recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them.") The Supreme Court has explained that a federal court may exercise ancillary jurisdiction "(1) to permit disposition by a single court of claims that are…factually interdependent; … and (2) to enable a court to function successfully… to manage its proceedings, vindicate authority and effectuate its decrees." (internal quotations and citations omitted).  *Kokkonen*, 511 U.S., at 379-380.  "The Supreme Court's decision *Peacock v. Thomas*, 516 U.S. 349 (1996), describes the breadth of a federal court's inherent power to enforce its judgments through the exercise of ancillary jurisdiction over third parties…The [] district courts have jurisdiction over a broad

range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments—including attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances." *Trustees of 1199/SEIU Greater New York Ben. Fund v. Sieger*, No. 07-CV-9744(DLC), 2010 WL 3911474, at *3 (S.D.N.Y. Oct. 5, 2010) (internal citations and quotations omitted).  Indeed, the doctrine of ancillary jurisdiction is necessary in order to allow the efficient management and enforcement of foreign judgments when they are registered under 28 U.S.C. §1963.  *See generally Peacock v. Thomas*, 516 U.S. 349 (1996).

In *Peacock*, the plaintiff obtained a judgment against defendant Tru-Tech Corporation. When Tru-Tech was unable to satisfy the judgment, the plaintiff brought a supplemental proceeding in which it sought to pierce the corporate veil and collect the judgment from Peacock, an officer of Tru-Tech.  *Id*. at 351-352.  The Supreme Court held that the supplemental proceeding was, in fact, an independent action against Peacock based on a new theory of liability for which an independent basis for subject matter jurisdiction must be established.  *Id*. at 353-354.  Therefore, the Supreme Court held that ancillary jurisdiction could not be exercised in such circumstances.  In reaching this holding, the Supreme Court observed:

> We have reserved the use of ancillary jurisdiction in subsequent proceedings for the exercise of a court's inherent power to enforce its judgments.  Without jurisdiction to enforce a judgment entered by a federal court, the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution.  In defining that power, we have approved the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgment-including attachment, mandamus, garnishment and the prejudgment avoidance of fraudulent conveyances.

*Peacock*, 516 U.S., at 356 (internal citations omitted).  The Supreme Court further noted that it had "never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an

obligation to pay an existing federal judgment on a person not already liable for that judgment."
*Peacock*, 516 U.S., at 357.

In applying *Peacock*, the Second Circuit has recognized a "distinction for jurisdictional
purposes" between "an action to collect a judgment...and an action to establish liability on the
part of a third party."  *Epperson v. Entertainment Express, Inc.*, 242 F.3d 100, 104 (2d Cir. 2001)
(holding that a claim by a judgment creditor against a judgment debtor and third parties to whom
debtor had fraudulently conveyed liens could proceed under the ancillary jurisdiction of the
district court).  The Second Circuit further observed that "since *Peacock*, most courts have
continued to draw a distinction between post-judgment proceedings to collect an existing
judgment and proceedings, such as claims of alter ego liability and veil-piercing, that raise an
independent controversy with a new party in an effort to shift liability."  *Id.* at 106.  Ultimately,
the Second Circuit held that "[w]here the post-judgment proceeding is an effort to collect a
federal court judgment, the courts have permitted judgment creditors to pursue, under the
ancillary enforcement jurisdiction of the court, the assets of the judgment debtor even though the
assets are found in the hands of a third party."  *Id*.  In short, as long as the ancillary court is
purely enforcing a foreign judgment and not imposing new liability on third parties, then it is
acting within its power.   More importantly, in the factual context before this Court, ancillary
authority extends to a third party, if that third party is holding assets for a judgment debtor and
there is a valid claim against the assets.

Here, it is clear to the Court that plaintiffs and intervenor Solaz seek only to collect the
judgments they obtained in Vermont and registered here in Connecticut against defendant
Barnes's distributable interest that is held by Barnstormer.  Neither plaintiffs nor intervenor
Solaz have set forth any theory in their pleadings where they seek to shift liability for their

judgments to Barnstormer, its individual members or any other third party in the event they are unable to collect their judgment against defendant Barnes' transferable interest.  While the Court recognizes it will have to resolve issues of whether defendant Barnes has a distributable interest in Barnstormer and the amount of any such distributable interest, the resolution of such issues is inextricably intertwined with any determination of the proceeds available to satisfy the judgments obtained by plaintiffs and intervenor Solaz and their competing priority interests. These related determinations do not, however, constitute any attempt to shift liability for the entirety of the debt on to new parties separate and apart from the original judgment debtor, namely defendant Barnes.  As such, these determinations fall within the Court's proper exercise of ancillary jurisdiction.  *See Kokkonen*, 511 U.S. 375, at 379-80 (ancillary jurisdiction is appropriate to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees).  In short, plaintiffs and intervenor Solaz assert this enforcement action solely against the judgment debtor.  Similar to a garnishment proceeding, the present action does not seek to impose new liability on a third party.  Rather, it seeks only to collect a judgment against an alleged asset of the judgment debtor in the hands of a third party and is therefore squarely within this Court's ancillary jurisdiction to enforce judgement.  *Cf. Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 834 n. 10 (1988) ("[G]arnishment in the federal system is available under the Federal Rule that provides the '[p]rocess to enforce a judgment.'").

IV.    **Motion to Compel Arbitration and Limit the Scope of the Proceedings by <u>Barnstormer Summit Lift, LLC</u>**

Barnstormer moves to compel arbitration of the issue of whether defendant Barnes has a distributable interest and the amount of any such interest, and Barnstormer further seeks to limit the scope of the proceedings before this Court to the order of priority of the charging orders of

plaintiffs and intervenor Solaz.  Doc. No. 14.  It is undisputed that Defendant Barnes is a member of Barnstormer and a signatory to Barnstormer's Operating Agreement (hereinafter, "Operating Agreement").  The Operating Agreement provides that any unresolved dispute between parties to the Operating Agreement is subject to mandatory mediation and, if not resolved, mandatory arbitration.  Doc. No. 30-2, ¶¶ 12.1.N and 12.1.O.  Barnstormer states that there is a "dispute as to whether Defendant has a positive capital account."  Doc. No. 15 at 4.  Accordingly, Barnstormer further argues that, pursuant to the Operating Agreement, this Court should compel arbitration to determine whether Defendant Barnes does, in fact, have a distributional interest.  Doc. No. 15.  While Barnstormer notes its belief that plaintiffs, intervenor Solaz and Trustee Del Negro could be compelled to participate in arbitration, Barnstormer also indicates that it has invited them to participate as parties to any arbitration between it and defendant Barnes arising under the Operating Agreement.  Doc. No. 15.  Plaintiffs, intervenor Solaz and Trustee Del Negro oppose Barnstormer's motion to compel arbitration and to limit the scope of the proceedings.  In short, Barnstormer's motion to compel arbitration presents two issues for this Court to address, namely, whether all parties to this action can be compelled to arbitrate the question of whether Barnes has a distributable interest and, if not, whether this Court should compel arbitration solely between Barnstormer and Barnes and await the resolution of that matter in an arbitration forum before proceeding with the remaining issues in this matter.

On a motion to compel arbitration, the moving party has the initial burden of showing that an agreement to arbitrate exists.  *Roller v. Centronics Corp.*, No. 87-CIV-5715(JFK), 1989 WL 71200, at *2 (S.D.N.Y. June 22, 1989) (citing to *Nederlandse Erts–Tankersmaatschappij*, *N.V. v. Isbrandtsen Co., Inc.*, 339 F.2d 440, 442 (2d Cir. 1964)).  First, this Court must determine whether there is a valid agreement to arbitrate between the parties.  *Id.*; *see* 9 U.S.C. §4; *see also*

*Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (The critical issue facing any "court considering a motion to compel arbitration is therefore whether the parties have indeed agreed to arbitrate[,]" in as much as the "arbitrator has no authority of any kind with respect to a matter at issue absent an agreement to arbitrate[.]"). "The threshold question facing any court considering a motion to compel arbitration is whether the parties have indeed agreed to arbitrate." *Doctor's Associates, Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) (internal quotations and alterations omitted).

Barnstormer contends that the Operating Agreement requires mediation and arbitration between the parties to determine the amount of funds available to creditors from the distributive interest of defendant Barnes in Barnstormer.  Doc. No. 15.  In resisting arbitration, plaintiffs and Solaz contend that they never entered into a valid arbitration agreement with defendant Barnes or other members of Barnstormer, and, thus, they are not bound by its terms.  The Court agrees. The plain text of the arbitration provision in the Operating Agreement applies only to "parties." Doc. No. 30-2, at ¶12.2(O).  It is clear from a reading of the Operating Agreement that the parties subject to that agreement are Barnstormer, HIREHCO, and James Barnes.  Plaintiffs and intervenor Solaz were never parties to the Operating Agreement.  Accordingly, Barnstormer cannot force plaintiffs and Mr. Solaz to arbitrate the entirety of this dispute because they were not signatories to the Operating Agreement and are not bound by the arbitration provision contained in the Operating Agreement.  *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 392 (2d Cir. 2011) (noting that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").

 Recognizing this obstacle, Barnstormer advances a number of theories under which it believes that plaintiffs and intervenor Solaz are assignees of rights and obligations under the

Operating Agreement and, therefore, are bound by the arbitration provision and can be compelled to arbitrate this dispute.  First, Barnstormer argues that plaintiffs and intervenor Solaz, by virtue of the charging orders they obtained, are assignees of Barnes under section 9.1 of the Operating Agreement and thus bound by the provisions of the Agreement.  In pertinent part, section 9.1 of the Operating Agreement provides:

> [A] Member may not sell, assign, convey, pledge, hypothecate, encumber or otherwise transfer in any manner all or any part of the Interest of such Member to any Person who is not a Member, without the prior written consent of a Majority of the Managers, which consent may be granted or withheld in their sole discretion….provided, however, that, if the Company is required to recognize a transfer that is in contravention of this Agreement,…(ii) the purported transferee and transferor will become as assignee with respect to such Interests purportedly transferred in contravention of this Agreement.

In turn, under the Operating Agreement, the term "Interest" is defined as "an ownership interest in the Company, including any and all benefits to which the holder of such an Interest may be entitled as provided in this Agreement[], together with all obligations of such holder to comply with the terms of this Agreement[.]"  Doc. No. 30-2, at ¶1.1.  Barnstormer argues that the charging orders obtained by plaintiffs and intervenor Solaz constitute a transfer of Barnes' interest within the meaning of section 9.1 of the Operating Agreement.

Not only does Barnstormer fail to point to any precedent that supports such a view, but the explicit language of Connecticut's charging order statute, Conn. Gen. Stat. § 34-259b, does not support Barnstormer's argument.  That statute expressly refers to a charging order as a "lien" and provides, in pertinent part, that "[t]o the extent that the transferable interest of the judgment debtor is so charged, the judgment creditor has only the right to receive any distribution or distributions to which the judgment debtor would otherwise have been entitled in respect of such transferable interest."  *See* Conn. Gen. Stat. § 34-259b(a).  In the Court's view, this makes clear that the charging order is effectively a judicially-authorized lien against Barnes' transferable or

16

distributable interest and is not in and of itself an entire transfer of Barnes' ownership interest in Barnstormer such that the recipients of the charging order, plaintiffs and intervenor Solaz, inure to all of Barnes' obligations and benefits under the Operating Agreement.  *See Rockstone Capital, LLC v. Marketing Horizons Ltd.*, Docket No. NNH-CV-065006818S, 2013 WL 4046597, at *2 (Conn. Super., July 17, 2013) (charging order does not entitle the creditor to participate in the management and affairs of the limited liability company so as to become or experience any rights of a member); *see also Madison Hills, Ltd. v. Madison Hills, Inc.*, 35 Conn. App. 81, 84-85, 644 A.2d 363 (Conn. App. 1994) (noting, in the context of a limited partnership, that a charging order is not an assignment and the charging creditor does not become a full partner and is not entitled to manage the partnership).  Accordingly, the Court concludes that plaintiffs and Intervenor Solaz are not assignees within the meaning of section 9.1 of the Operating Agreement.

Second, invoking *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995), Barnstormer argues that a non-signatory can be held to the terms of an arbitration clause if the rights of a non-signatory are derivative of the rights initially held by a signatory to the agreement.  Barnstormer posits that RTM and intervenor Solaz seek to be paid funds that are derivative and arise solely from Barnes' rights in Barnstormer and those rights can only be determined in mediation and arbitration.  In *Thomson-CSF*, 64 F.3d 773, the Second Circuit identified five specific theories upon which a court could enforce an arbitration agreement against a non-signatory to the agreement: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.  *Thomson-CSF*, 64 F.3d, at 776.

On the factual record presently before the Court, none of these theories are applicable to plaintiffs and intervenor Solaz.  Barnstormer has not presented any facts suggesting that the

plaintiffs and/or intervenor Solaz signed any document which incorporated by reference the Barnstormer Operating Agreement and its arbitration provision.  Nor is there any factual basis from which the court can conclude that plaintiffs and Solaz explicitly assumed any of Barnes' rights and obligations under the Operating Agreement.  Not only does the Operating Agreement specifically prohibit assignment and expressly disavow any third party rights in the Operating Agreement, *see* Doc. No. 30-2, ¶¶ 12.1.L and 12.1.M, but the charging order, for the reasons already explained above, only operates as a lien, not a transfer or assumption of an ownership interest in Barnstormer with attendant rights and responsibilities.  Likewise, there is no evidence before the Court that Barnes ever acted in an agency capacity with respect to plaintiffs or Solaz.  Further, Barnes, Solaz and plaintiffs are all separate individuals and/or entities who appear to have engaged in arms-length transaction that gave rise to the charging orders and they have long held adversarial positions.  Accordingly, Barnstormer has not advanced any theory premised under *Thomson-CSF's* veil piercing/alter ego approach.

Lastly, the Court also considered whether the arbitration clause binds plaintiffs and Solaz on a theory of estoppel.  "A non-signatory may be estopped from avoiding arbitration where it 'knowingly accepted the benefits of an agreement with an arbitration clause.'" *Bank of America Nat'l Assn. v. Sopher*, No. 10-CIV-8870(LTS)(KNF), 2011 WL 2419872, at *3 (S.D.N.Y. June 8, 2011) (quoting *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001)); *see also Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, *U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993.  Caselaw further teaches that the non-signatory's benefit must be a "direct" one, meaning it must "flow[ ] directly from the agreement." *Oppenheimer & Co. Inc. v. Deutsche Bank AG*, No. 09-CIV-8154(LAP), 2010 WL 743915, at *2 (S.D.N.Y. Mar. 2, 2010) (quoting *MAG Portfolio Consultant*, 268 F.3d 58). A benefit is indirect – and therefore cannot support

estoppel – "where the non-signatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452, 458 (S.D.N.Y. 2007) (quoting *MAG Portfolio Consultant*, 268 F.3d 58). Put differently, "benefits are direct when specifically contemplated by the relevant parties; and benefits are indirect when the parties to the agreement with the arbitration clause would not have originally contemplated the non-signatory's eventual benefit." *Life Technologies Corp. v. AB Sciex PTE., LTD.*, 803 F. Supp. 2d 270, 276 (S.D.N.Y. 2011).

Here, the Operating Agreement did not directly benefit plaintiffs or intervenor Solaz in any way.  The Operating Agreement was intended to "assist [Barnes] with the construction and financing of the new chair lift at the Hermitage Inn ski resort located in West Dover, Vermont, to be called the 'Barnstormer Summit Lift' which commenced operations in October 2015."  Doc. No. 30-2, at ¶2.2.  The Court has no evidence before it that plaintiffs and/or intervenor Solaz received any direct benefit flowing from the financing of the chairlift.  They were not members of Barnstormer, nor were they active in the management, construction, or financing, of the chair lift.  Accordingly, the Court finds that plaintiffs and intervenor Solaz cannot be compelled to arbitrate on the theory of estoppel.

To the extent that Barnstormer's theory of derivative rights suggests that plaintiffs and intervenor Solaz are third party beneficiaries of the Barnstormer Operating Agreement, any such third party beneficiary theory is inapplicable.  "The ultimate test to be applied in determining whether a person has a right of action as a third party beneficiary is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party beneficiary and…that intent is to be determined from the terms of the contract read in the light of

the circumstances attending its making, including the motives and purposes of the parties…"
*Wasniewski v. Quick and Reilly, Inc.*, 292 Conn. 98, 109, 971 A.2d 8 (Conn. 2009).

There is no evidence before the Court here that, at the time that Barnstormer and defendant Barnes entered into the Operating Agreement, either the plaintiffs or intervenor Solaz were in any manner intended third party beneficiaries of any rights or obligations under the Operating Agreement.  Indeed, to the contrary, the Operating Agreement expressly provided that "[n]o third party shall have any right under this Agreement."  Doc. No. 30-2, at ¶12.1.M.

Having concluded that there is no basis to compel arbitration of this matter in its entirety, the sole question left for the Court to consider is whether the Court should compel arbitration solely between Barnes and Barnstormer as to whether Barnes has a distributable interest in Barnstormer, and if so, the amount of any such interest and defer until conclusion of such arbitration the priority of the charging orders between plaintiffs and intervenor Solaz.  For the reasons set forth below, the Court declines to do so.

Section 12.1.O of the Operating Agreement provides that:

> If any dispute, claim, disagreement or other matter arising from or relating to this Agreement or the alleged breach of this Agreement cannot be settled within thirty (30) days after a party sends written notice to each other party, or by mediation as provided in this Agreement, the parties shall submit such matter to binding arbitration[.]

Doc. No. 30-2, ¶12.1.O.  The Court has considered whether, in the unique context of this third party action, whether the dispute between Barnstormer and Barnes as to whether he has a distributable interest and in what amount falls within the scope of the arbitration provision.  If this were a first party action directly between Barnstormer and Barnes, there is little dispute that this would fall within the purview of the Operating Agreement's arbitration provision.  However, that is not the context here.  This is essentially an action instituted by a third party to enforce a judgment and to seek application of a judicially issued charging order against a purported asset

of a judgment debtor.  Intervenor Solaz is a third party intervenor also seeking to enforce a judgment by way of a charging order just as the plaintiffs have done.  Connecticut's charging order statute permits this Court to grant a charging order, which it has done, and further vests the Court with broad authority to "make all other orders necessary to give effect to the charging order."  Conn. Gen. Stat. § 34-259b(b).  In the context of this third party action to enforce a judgment, the Court's determination of the whether there is a sum of money available against which the charging orders can enforced and in what priority is entirely dependent upon the Court's determination of whether Barnes has a distributable interest and in what amount.  Thus, the determination of these questions falls well within the broad authority conferred by the Court in Connecticut's charging order statute to "make all [] orders necessary" to give effect to the charging order.  *See id.*  Accordingly, in the context of this action, the Court cannot permit Barnes and Barnstormer to simply sever a dispute that is so integral to the Court's ability to give effect to the charging orders and compel that portion of the dispute be sent to an arbitral forum.

However, even if the Court were to make the assumption that the question of the existence of a distributable interest and the value of any such interest does fall within the scope of the Operating Agreement's arbitration provision even in this third party action, the Court still reaches the conclusion that sending that portion of this dispute to arbitration pursuant to that provision and awaiting the resolution of those issues before proceeding further with this action, would violate public policy.

The Supreme Court has made clear that courts may not enforce contracts that "violate[ ] some explicit public policy."  *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, at 766 (1983); *see also United Paperworkers Intern., AFL-CIO v. Misco, Inc.*, 484 U.S. 29, at 42 (1987). This includes contracts for the arbitration of disputes.  *See Doctor's Associates, Inc., v.*

*Casarotto*, 517 U.S. 681, at 686–87 (1996) ("Generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA]."). This Court must determine "whether there is some competing statute or policy sufficient to outweigh the strong federal policy favoring arbitration, and hence to foreclose arbitration of the dispute raised by plaintiff." *Booker v. Robert Half Int'l, Inc.*, 315 F.Supp.2d 94, 98 (D.D.C. 2004) (citing to *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614 (1985)).  The competing policy "must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *W.R. Grace*, 461 U.S. at 766 (internal quotation marks omitted).  If enforcement of the arbitration provision violates some explicit public policy, the Court is required to refuse to do so.  *Id*.  Accordingly, this Court has to determine whether there is a strong public policy that sufficiently outweighs the federal interest favoring arbitration, thereby foreclosing even the arbitration of the particular dispute over the existence and amount of a distributable interest between Barnes and Barnstormer.

In this Court's view, there is an obvious and strong public interest in federal courts' enforcement of their own judgments.  *W.R. Grace*, 461 U.S. at 766.  As a preliminary matter, federal law specifically provides for the registration of judgments entered by other federal courts of the United States:

> A judgment in an action for the recovery of money or property entered in any court of appeals, district court, bankruptcy court, or in the Court of International Trade may be registered by filing a certified copy of the judgment in any other district...when the judgment has become final[.] A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner.

28 U.S.C. § 1963.  "When a judgment is properly registered under § 1963, the registration provides, so far as enforcement is concerned, the equivalent of a new judgment of the

registration court." *Gilly v. Ocwen*, No. 3:16-MC-00021(JAM), 2016 WL 868167, at *2 (D.

Conn. Mar. 7, 2016) (quotation omitted).  Section 1963 merely requires a party to file a certified

copy of the judgment in the district in which it seeks to register the judgment.  28 U.S.C. § 1963.

Notice to parties and judicial involvement is not required under the terms of the statute.  *Id.*  In

this instance, plaintiffs obtained a default judgment against Barnes in federal court in the District

of Vermont and registered that judgment in the District of Connecticut.  Upon plaintiffs doing so,

their judgment has the status of a judgment rendered by the United States District Court for the

District of Connecticut.

In *Peacock v. Thomas*, 516 U.S. 349, as noted above, the Supreme Court explicitly

recognized that federal courts possess inherent authority derived from the Constitution of the

United States to enforce their judgments.  Such authority is a method of ensuring that the power

bestowed upon the judiciary by the Constitution is not diminished by a disregard of court orders.

*Peacock,* 516 U.S. 349.  The Supreme Court further observed that district courts have

jurisdiction over a "broad range of supplementary proceedings involving third parties to assist in

the protection and enforcement of federal judgments-including attachment, mandamus,

garnishment, and the prejudgment avoidance of fraudulent conveyances."  *Id.* at 356.  Without

such authority, the Court emphasized that "the judicial power would be incomplete and entirely

inadequate to the purposes for which it was conferred by the Constitution."  *Id.  Peacock*

ultimately concluded that exercise of ancillary jurisdiction over third parties was necessary for

the enforcement of judgments and "to enable a court to function successfully, that is, to manage

its proceedings, vindicate its authority, and effectuate its decrees."  *Id.*

In addition to a strong policy interest in the Court's inherent power to protect and enforce

its judgments, Fed. R. Civ. P. 69 provides procedures for enforcing federal money judgments and

has the force of statute. *Schneider v. National R.R. Passenger Corp.*, 72 F.3d 17, 19 (2d Cir.

1995). Rule 69(a) states that unless a court orders otherwise, enforcement of a judgment shall be

by writ of execution. Fed. R. Civ. P. 69(a)(1). The rule further provides that the procedure for

execution or other enforcement of the judgment, including supplementary proceedings, shall be

pursuant to local state law practice and procedure, unless an applicable statute of the United

States would dictate otherwise. *Id.*

In this particular case, Fed. R. Civ. P. 69 and Conn. Gen. Stat. § 34-259b, the charging

order statute, make very clear that there is a statutory framework for this Court to enforce one of

its judgments. In this Court's view, the ability of a party to enforce a judgment and the Court's

inherent ability recognized in *Peacock* to supervise such enforcement and conduct any

proceedings to adjudicate issues relevant to and enforce a judgment are fundamental to inspiring

the public's confidence in the integrity of federal court judgments. It is a critical and important

structural feature of the federal courts and the federal judiciary's proper functioning and it is a

clearly defined public policy evident in Supreme Court precedent such as *Peacock* and in  the

statutory framework of Fed. R. Civ. P. 69, Conn. Gen Stat. § 34-259b and Conn. Gen. Stat. § 52-

356c (determination of interests in disputed property). This framework embodies an explicit

public policy by which federal courts have supervisory authority over their judgments and should

not cede that authority to an arbitration forum, one of the major risks of which is the likelihood

of delay. The likelihood of delay is particularly concerning where defendant Barnes' motivation

to defend in an arbitral forum is subject to doubt given his defaults in Vermont. Severing the

issue of the existence and value of Barnes' distributable interest to be litigated in arbitration

would directly contravene a strong public policy interest in having this Court retain its ability to

supervise a proceeding to enforce its judgment, to ensure against undue delay and to manage this

process in a way that promotes efficient resolution of these proceedings.  Accordingly, it is necessary for this Court to make all determinations necessary to a resolution of these proceedings and, therefore, that portion of Barnstormer's motion which seeks to compel arbitration is denied.

**V.**     <u>**Conclusion**</u>

For all of the foregoing reasons as articulated in its oral, transcript ruling on September 29, 2021, Barnstormer's *Motion to Compel Arbitration and Limit the Scope of the Proceeding* (Doc. No. 14) is **GRANTED** as to its Motion to Intervene and **DENIED** as to its Motion to Compel Arbitration and Limit the Scope of the Proceeding.

**SO ORDERED**, on this 30th day of November 2021, at Bridgeport, Connecticut.

<u>/s/ S. Dave Vatti</u>
Hon. S. Dave Vatti
United States Magistrate Judge